IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GABRIEL JIMENEZ (ESTATE OF),

       Plaintiff,

v.                                        CIV 08-0817 KBM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

# MEMORANDUM OPINION & ORDER

THIS MATTER is a Social Security appeal for Claimant Gabriel Jimenez, who is now deceased.  Though his estate is prosecuting this appeal, for ease of reference, my use of the term "Plaintiff" refers to Mr. Jimenez.  A male attorney represented Plaintiff at the Administrative level, but a female attorney represents him in this appeal.  Hence, there are pronoun changes in the opinion in reference to counsel.

After remanding the matter for a second hearing and decision, the Appeals Council denied review of Administrative Law Judge ("ALJ") Ben Willner's decision, thereby making his decision final and the decision under review here.  *See Administrative Record* ("*Record*") at 5; *Bowman v. Astrue,* 511 F.3d 1270, 1272 (10th

Cir. 2008) ("Because the Appeals Council denied review, the ALJ's decision is the Commissioner's final decision for purposes of this appeal.").

Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. *See Docs. 7, 9.* The entire record has been meticulously reviewed. *E.g., Grogan v. Barnhart,* 399 F.3d 1257, 1262 (10th Cir. 2005). Plaintiff raises procedural and substantive claims and asks this Court to reverse and award benefits to the estate or, alternatively, for a remand for rehearing. *See Doc. 14.* For the reasons below, I reject the procedural claims, but remand the case for further proceedings.

# I.  Background

The Administration engaged psychiatrist Dr. Gerald Fredman as a consulting examining physician. *See Record* at 205. His June 2004 report provided an opinion on Plaintiff's limitations:

> From a psychiatric perspective, there would be moderate limitations understanding and remembering basic instructions and mild limitations with concentration. There would be mild limitations interacting with the general public or coworkers. There would be mild to moderate limitations adapting to changes in the workplace and persisting at tasks at basic work.

*Id.* at 208. The subsequent August 2004 Psychiatric Review Technique ("PRT")

and Mental Residual Function Capacity ("RFC") forms completed by nonexamining consulting physician LeRoy Gabaldon repeat Dr. Fredman's "moderate" limitations.  These documents are more descriptive.

On the PRT form, Dr. Gabaldon checked the "difficulties in maintaining concentration, persistence, or pace" section as "moderate."  *Id.* at 219.  On the RFC form, he checked several sections as "moderately limited."  They are:  "ability to maintain attention and concentration for extended periods," "ability to get along with coworkers or peers with out distracting them or exhibiting behavioral extremes;" "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;" "ability to respond appropriately to changes in the work setting;" "ability to travel in unfamiliar places or use public transportation;" and "ability to set realistic goals or make plans independently of others."  *Id.* at 280-81.[1]

_____

[1]  Dr. Gabaldon repeated only general characterizations about Plaintiff's limitations:

> Mr. Jimenez alleges to be unable to work due to mental and physical problems.  Although he may be depressed/anxious, his assertion of impairment does not appear to be consistent with available evidence.

> Ms. (sic) Jimenez admits to a long history of substance abuse but has been substance free after his release from the treatment facility in 2003.  There is no evidence of thought disorder or of severe cognitive limitations.  He does appear to have some limitations in his capacity to process information.  Mr. Jimenez is able to care for

The first ALJ found that Plaintiff had four "severe" mental impairments at Step 2 – "depression, an attention deficit/hyperactivity disorder (AD/HD), a dysthymia disorder, and an anxiety disorder." *Record* at 342.  This finding was based on:  the medical records from his voluntary admission to the "Turquoise Lodge" in 2003 for polysubstance abuse; the diagnosis of Dr. Fredman; Dr. Gabaldon's PRT form; and, a psychiatric assessment by the University of New Mexico Mental Health Center.  *Id.*  Because Plaintiff testified that he was no longer using drugs or alcohol, the first ALJ found his past substance abuse immaterial.  *Id.* at 342-43.

The first ALJ asked the vocational expert a hypothetical that assumed "no physical impairments or physical limitations but has a severe mental impairment and that would be depression, panic attacks and ADHD."  *Id.* at 585.  The vocational expert testified that Plaintiff could perform his past relevant work

---

his own personal needs and engage in some household activities; he can relate with others.  He was recently evaluated by Dr. M. Gzaskow who does comment on his functional abilities.  No severe problems were noted at the field office when submitting his application.

Mr. Jimenez has the capacity to understand/remember.  He may have some limitations in his capacity to persist/attend, to socialize and to adapt to change.

*Record* at 282.

4

because he had been working with those conditions in 2001. *Id.* If the limitation was sedentary work, then Plaintiff could not perform his past work but could perform others. *See id.* at 585-86. Further hypothetical situations posed by the ALJ did not involve any discussion of mental limitations, so counsel asked the vocational expert about the effect of the "moderate limitation understanding or remembering basic instruction" finding by Dr. Fredman. *Id.* at 588. The VE testified those limitations would reduce the number of jobs by 30 percent. *Id.* When he asked about Dr. Gabaldon's PRT "moderate limitation in the ability to concentrate, persist a job duties and maintain a work pace," she responded that limitation will "fall within the 30 percent reduction that I previously gave." *Id.* at 588-89. When he asked about Dr. Gabaldon's RFC "moderate limitation in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," the ALJ asked counsel to "tell me what you mean by behavioral extremes . . . if you describe to me specifically what you're speaking of . . . I'll allow the question." *Id.* at 589. Noting that he was simply quoting what was on the Administration's form, *id.*, he rephrased the question as "a moderate limitation, which is halfway between not significantly limited and markedly limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," *id.* at 590. The ALJ did not reiterate her objection

to the lack of specificity in the phrase "behavior extremes" and allowed the question. *Id.* Counsel posed an additional question on the RFC sections "maintain socially appropriate behavior," adhere to basic standards of neatness and cleanliness," "respond appropriately to changes in the work setting," "set realistic goals," and "make plans independently of others." *Id.* at 590-91. The ALJ then stopped counsel from asking more of the same because, although she recognized what the RFC provided, she did not believe those limitations were supported in the record. The vocational expert testified that together all of the "moderate" mental limitations posed would reduce the number of jobs by 50 percent. *See id.* at 590-92.

The Appeals Council remanded because of the first ALJ's treatment of Plaintiff's mental impairments. Although the first ALJ mentioned Plaintiff's four mental conditions to the vocational expert and allowed defense counsel to question the vocational expert about the effects of Plaintiff's mental limitations, the ALJ did not personally "identify the claimant's non-exertional mental limitations" in her hypothetical questions to the vocational expert. *Id.* at 354. The Appeals Council also found that the ALJ's discussion of residual functional capacity did not contain a "function-by-function assessment" of Plaintiff's physical and mental abilities or "sufficient rationale with specific reference to evidence of record in support of the

assessed limitations." *Id.* at 354. It therefore, instructed the ALJ to '[g]ive further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to the evidence of record." *Id.* at 355. It also instructed the ALJ to take supplemental evidence from the vocational expert to clarify the effect of any limitations on the occupational base and to clarify any conflicts between the vocational expert's testimony and occupations publications. *Id.* It closed with instructions for the ALJ to *"offer . . . an opportunity for a new hearing, take any further action needed to complete the administrative record and issue a new decision."* *Id.* (emphasis added)

After the remand, ALJ Willner reached a decision that was diametrically opposed to the first ALJ. He found that Plaintiff had no severe mental impairments at Step 2 and, therefore, did not discuss them in his residual functional capacity finding at Step 4 or in his hypotheticals to the vocational expert at Step 5. Also in direct contrast to the first ALJ, Plaintiff's drug and alcohol abuse figured prominently in ALJ Willner's Step 2 and Step 4 analyses. *See id.* at 18-24; 624-31. At the second hearing, counsel again began to cross-examine the vocational expert concerning "[m]oderate limitations understanding and remembering basic instructions." *Id.* at 631. ALJ Willner stated that he wanted more specificity in the question – he wanted counsel to define a "job-related functional limitation" that

encompassed the characterization "moderate."  *See id.* at 631-33.  Counsel then

defined the limitation as for one-third of the workday, Plaintiff would have

difficulty understanding and remembering basic instructions and would not be able

to complete assigned tasks.  *Id.* at 633-34; 641-42.  The vocational expert

responded that with a limitation like that, the employee "wouldn't be able to hold"

any of the positions she previously identified.  *Id.* at 634, 642.

Counsel attempted to repeat the same one-third day limitation in terms of

"appropriate social interaction with coworkers," but ALJ Willner found that also

was not a specific enough description.  *See id.* at 634-37.  He explained that

> [a]s you well know we do get guidance back from the
> Appeals Council quite regularly . . . because we both,
> Judge's [sic] as well as counsel, at times do not pose the
> questions in such a manner that are sufficiently tied to
> the limitations in the work place.  So that's what I'm
> trying to do, I'm certainly giving you every opportunity to
> pose the questions, it's just that they need to be in those
> kind of functional limitations.

*Id.* at 637-38.  Counsel and the ALJ agreed with the characterization of a need for

Plaintiff to be isolated in his job, with at most only occasional interaction with

coworkers.  *See id.* at 639-41.  The vocational expert testified that limitation would

eliminate the jobs.  *See id.* at 641.

# II.  Procedural Claims

## A.  *Law Of The Case*

Plaintiff asserts that ALJ Willner's Step 2 finding of no severe mental impairments violates the "doctrine of the law of the case.  In support, Plaintiff cites *Williams v. Apfel,* 65 F. Supp. 2d 1223, 1230 (N.D. Okla. 1999) (and cases cited therein); *Key v. Sullivan,* 925 F.3d 1056, 1060-61 (7th Cir. 1991); and 20 C.F.R. §§ 303.977(b), 416.1477(b).  *See Doc. 14* at 7-8.

I disagree that the doctrine is grounds for remand when the appellate direction that is alleged to have been ignored comes from the Appeals Council.  First, the cases Plaintiff cites both involved remands by a court.  Also, the regulations Plaintiff cites state that on remand the ALJ "shall take any action that is ordered by the Appeal Council," but go on to state that the ALJ "may take any additional action that is not inconsistent with the Appeals Council's remand order."  Finally, the position Plaintiff asks this Court to take is contrary to Tenth Circuit authority and to the position I and other Magistrate Judges in this District have taken.

> Ms. Miller's primary argument on appeal is that the ALJ's actions were inconsistent with the Appeals Council remand order. . . .  Social Security regulations provide that, in the event the Appeals Council orders a remand,

the ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." . . . Preclusion principles, however, do not "bind the ALJ to his earlier decision. To hold otherwise would discourage administrative law judges from reviewing the record on remand, checking initial findings of fact, and making corrections, if appropriate." *Campbell v. Bowen,* 822 F.2d 1518, 1522 (10th Cir. 1987). This court has "decline[d] to constrain the ALJ in a manner not mandated by the regulations." *Id. See also Hamlin v. Barnhart,* 365 F.3d 1208, 1224 (10th Cir. 2004) (stating that "[i]t was certainly within the ALJ's province, upon reexamining [claimant's] record [after Appeals Council remand], to revise his RFC category"); *Houston v. Sullivan,* 895 F.2d 1012, 1015 (5th Cir. 1989) ("Once the case was remanded to the ALJ to gather more information about the extent of [claimant's] disability, the ALJ was free to reevaluate the facts."). FN3

[And in that footnote] Claimant's cited authority does not detract from the rule this court established in *Campbell.* The cases relied upon by Ms. Miller generally involve a *remand from a <u>court</u>, not an administration agency.* They discuss and apply the law of the case doctrine, which requires the administrative agency on remand to conform its further proceedings to the judicial decision.

*Miller v. Barnhart,* 175 Fed. App'x 952, 955-56 (10th Cir. 2006) (emphasis added);

*see also e.g., Martinez v. Barnhart,* 444 F.3d 1201, 1205-06 (10th Cir. 2006) ("The

Appeals Council also directed the second ALJ in general terms to "offer the

claimant an opportunity for a hearing, take any further action needed to complete

the administrative record and issue a new decision." Contrary to Mr. Martinez's

assertions, these instructions did not require any particular result on remand, as the

second ALJ was fully authorized to award benefits to Mr. Martinez if such an award

was supported by the administrative record developed on remand.").[2] Accordingly,

---

[2]   Magistrate Judge Lynch has held that "the argument that the ALJ violated the Appeals Council's remand order is not cognizable by this Court. I have jurisdiction only to review the Commissioner's final decision, which in this case is the second ALJ's decision." *Sanchez v. Barnhart,* CIV 05-485 WPL (*Doc. 27* at 7) (citing 42 U.S.C. § 405(g), *Miller v. Barnhart,* 2006 WL 895503 at *4 (10th Cir. 2006), and *Gallegos v. Apfel,* 1998 WL 166064 at *1 (10th Cir. 1998)).

In a case that predates the above Tenth Circuit authority, in a case where the claimant was represented by the same firm as the claimant here, I observed that:

> The cases that I have found or to which I have been cited that have applied the "law of the case" doctrine in social security appeals do so in the context where the remand is from the *district court rather than from the Appeals Council. E.g., Patterson v. Apfel,* 1999 WL 1032973 (10th Cir. 1999) (and cases cited therein); *Williams v. Apfel,* 65 F. Supp. 2d 1223, 1229-30 (N.D. Okla. 1999) (same) . . . One Tenth Circuit decision did not specifically address the issue in terms of the doctrine of the law of the case, but it could be construed as suggesting the doctrine does *not* apply to interagency remands. *See Campbell v. Bowen,* 822 F.2d 1518, 1521-22 (10th Cir. 1987). For the *purposes of argument, however, I will assume* that the doctrine may be applied

*Demaria v. Social Security Administration,* CIV 03-908 KBM (*Doc. 15* at 4) (emphasis added).

On the other hand, Magistrate Judge Martinez remanded a case where the second ALJ failed to take evidence from a vocational expert as ordered on remand by the Appeals Council:

> The use of a vocational expert is usually within the discretion of the ALJ (20 C.F.R. § 404.1566(e)); however the Appeals Council, upon remand, specifically stated, *inter alia,* that the ALJ will "[o]btain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base." . . . The regulations mandate that an ALJ "*shall* take any action that is ordered by the Appeals Council." 20 C.F.R. § 404.977(b) (emphasis added). Also, some courts have held that a failure to abide by the terms of an Appeals Council

I reject the argument.

## B.  Cross-Examination

Pointing to the fact that Dr. Fredman and the Administration's own forms and regulations employ the term "moderate" to describe mental limitations, Plaintiff argues that ALJ Willner's prohibition on use of the term "moderate" during cross-examination violated due process. *See Doc. 14* at 11, *Doc. 16* at 4-6. The Administration counters that there was no impermissible limitation on cross-examination because the ALJ and counsel reached an accord on how to define the term. *See Doc. 15* at 10-11.[3]

Neither party cites any cases, regulations, or other Administration sources

---

remand order as required by 20 C.F.R. § 404.977(b) is erroneous as a matter of law and requires remand back to the ALJ. *See Hutchison v. Apfel,* 2001 WL 336986 at *11 (N.D. Tex. 2001) ("At the very minimum, this case should be remanded to defendant Commissioner . . . for development of the issues as had been previously ordered by the Appeals Council."); *Mann v. Chater,* 1997 WL 363592 at *3 (S.D.N.Y. 1997) ("The ALJ should have followed the order of the Appeals Council. . . .  Because he did not, I must remand this action.").  The Court finds that the ALJ's failure to obtain evidence from a vocational expert to clarify the effect of Plaintiff's functional limitations, as ordered by the Appeals Council, is an error that requires remand.

*Rasmussen v. Social Security Administration,* CIV 03-1414 LAM (*Doc. 18* at 14).

[3]  It also maintains that any error is harmless because ALJ Willner "properly found that [Plaintiff] did not have the mental limitations of function" in the first instance. *See Doc. 15* at 10.  This argument goes to the substance of the ALJ's decision and is therefore addressed elsewhere in this opinion.

concerning the permissible scope of cross-examination, or the narrower issue of the scope of cross-examination of a vocational expert.  I have only found a few cases that even touch on the subject, and they do not support a finding that due process was violated under the circumstances presented here.

The Administrative Procedures Act specifically provides that "[a] party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination *as may be required for a full and true disclosure of the facts.*"  5 U.S.C. § 556(d) (emphasis added).  In contrast, the Social Security Act and regulation does not contain a directive about cross-examination.  Nevertheless, in its *Perales* decision, the Supreme Court found this APA section is "consistent with, rather than differ[ing] from or supersed[ing], the authority given the Secretary" to "establish procedures" and to "regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same. . . even though inadmissible under rules of evidence applicable to court procedure."  *Richardson v. Perales,* 402 U.S. at 401, 409-10 (1971).  Based on this guidance from the *Perales* decision, in two unpublished cases, the Seventh and Eleventh Circuits have held that it is not a violation of due process for an ALJ to ask a claimant to phrase hypothetical questions in terms of a functional limitation, particularly if the claimant still has a

13

meaningful opportunity to cross-examine the vocational expert.[4]

Absent any binding authority to the contrary, I find these decisions persuasive because they are in accord with the Tenth Circuit's holding in *Galdean* (also an unreported decision). *Galdean v. Barnhart,* 46 Fed. App'x 920 (10th Cir. 2002). *Galdean* holds that "'the role of cross-examination in disability proceedings should remain limited'" and that, pursuant to *Perales,* "'the conduct of the hearing rests generally in the examiner's discretion.'" *Id.* at 923. In *Galdean,* the ALJ "confin[ed] counsel's questions to the issues on remand," but "did allow Mr. Galdean's lawyer to conduct a fairly substantial examination of the vocational

---

[4]   *See Gordon v. Astrue,* 249 Fed. App'x 810, 811, 813 (11th Cir. 2007) ("her due process rights were violated because her counsel was denied the opportunity to pose her desired hypothetical to the VE . . . although the *ALJ restricted the phrasing of Gordon's hypothetical question on cross-examination of the vocational expert so that the raw medical data would be expressed in terms of a mental residual functioning capacity,* her due process rights were not violated because she still had a meaningful opportunity for cross-examination") (emphasis added); *Mont v. Chater,* 1997 WL 201626 at **11-12 (7th Cir. 1997) ("Mont also claims his due process rights were violated because the ALJ interfered with Mont's attorneys cross-examination of the VE. . . . Mont argues that the ALJ deprived Mont "of his right to raise issues of fact, bias, or interest in order to clarify or impeach the VE's testimony." . . . Mont's attorney asked the VE nine questions, at most. . . . *The ALJ interrupted the questioning and limited the scope of some of the attorney's questions.* For example, in response to a question posed by Mont's attorney to the VE about stress, the ALJ interjected himself and said, '*[Q]uestions are asked as . . . functional limitations* and how it would impact upon jobs or the numbers of jobs that are available." . . . The ALJ interjected himself because the question was improper. . . . Mont's attorney could have raised proper issues of fact, bias, or interest in order to clarify or impeach the VE's testimony. The ALJ did not terminate Mont's attorney's cross-examination. . . . Rather, Mont's attorney had an opportunity to raise appropriate issues and was only prevented from asking improper questions. . . . Because Mont's cross-examination of the VE was not improperly interrupted by the ALJ and Mont was not improperly denied an explanation as to the function of the VE, his Motion for Summary Judgment is denied as to these arguments.") (emphasis added).

expert concerning topics consistent with the scope of remand." *Id.*  Thus, the

Tenth Circuit held although "the ALJ foreclosed counsel from exploring [the]

hand inquiry . . . this restriction falls short of a due process violation" and also was

not "regard[ed] . .  as manifesting a bias" by the ALJ against the claimant.  *Id.*

      Here, I believe the ALJ was overzealous in his insistence that counsel refine

the definition the moderate functional limitations identified by the experts.

Ultimately, what counsel was trying to ask about came from the experts' responses

about the degree of functional limitation in categories listed on forms designed by

the Administration.  If the Administration's own forms contain inadequate

descriptions, then it seems particularly unfair for the ALJ to place the burden on

claimant's counsel to cure an Administration defect.  However, in this particular

case counsel ably responded to the task of rephrasing his questions, the vocational

expert responded that all jobs were precluded, and counsel had no further

questions.  As such, although counsel's cross-examination was rendered more

difficult, he was not precluded from pursuing the line of questioning that he wanted

or from getting the result he expected from the vocational expert.  Under these

circumstances, I cannot conclude that there has been a denial of due process.

## C.  HALLEX

The "Hearings, Appeals and Litigation Law Manual" (HALLEX) and the

"Program Operations Manual System" (POMS) are the Administration's internal

procedural manuals.[5]  The POMS manual specifically provides that it "only

[contains] internal SSA guidance.  It is not intended to, does not, and may not be

relied upon to create any rights enforceable at law by any party in a civil or criminal

action."  https://secure.ssa.gov/apps10/poms.nsf/aboutpoms.  The HALLEX manual

does not contain a similar disclaimer.

HALLEX section I-2-1-20 addresses preparation of exhibit lists after a

hearing, and provides in part that:

> If the ALJ issues a fully favorable decision, a draft exhibit
> list may be used in the claim file. However, if the ALJ
> issues a partially favorable or unfavorable decision, the
> exhibit list must be prepared in final form and placed in
> the claim file.
>
> NOTE:  The Chief Administrative Law Judge (CALJ) in
> a Reminder dated October 25, 1999, stated that based on
> the constitutional due process requirement that a
> claimant has the right to know upon what basis the ALJ

---

[5]  HALLEX "conveys guiding principles, procedural guidance and information to the Office of Hearings and Appeals [and] also defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the Hearing, Appeals Council and Civil Actions levels," www.ssa.gov/OP_Home/hallex/I-01/I-1-0-1.html, while POMS provides "the internal operating instructions used by SSA field employees when processing claims for Social Security benefits," https://secure.ssa.gov/apps10/.

> is making the decision in his/her case, the preparation of
> exhibit lists in partially favorable and unfavorable cases is
> not a discretionary practice.  Exhibit lists must be
> prepared.

*See Doc. 14-2.*[6]

The Record submitted to this Court contains the usual typed "List of

Exhibits," but it is not as complete as usual.  The Record also contains a hand-

written "List of Exhibits," presumably the "draft exhibit list" prepared by ALJ

Willner.  The hand-written list fills in some of the detail missing from the typed

exhibit list.  *See Record* at 1-3.  The hand-written exhibit was not provided to

Plaintiff when ALJ Willner issued his decision.  Plaintiff submits that omission

violates HALLEX I-2-1-20, which in turn violates "due process" and is grounds for

reversal.  *See Doc. 14* at 13-14.

It is clear that, as a general proposition, "[s]ocial security hearings are subject

to procedural due process considerations."  *Yount v. Barnhart,* 416 F.3d 1233, 1235

(10th Cir. 2005) (citing *Richardson v. Perales,* 402 U.S. 389, 401-02 (1971) and

*Allison v. Heckler,* 711 F.2d 145, 147 (10th Cir. 1983)).  However, the Supreme

Court, Tenth Circuit, and this District have not decided whether HALLEX

provisions are binding on federal courts or whether a violation of HALLEX

---

[6]  Available online at www.ssa.gov/OP_Home/hallex/I-02/I-2-1-20.html.

constitutes a violation of procedural due process.  *See, e.g., Gallegos v.  Barnhart,*

CIV 02-1270 RLP (10/20/03 MOO, *Doc.  19* at 12-13); *Vigil v. Halter,* CIV 00-472

MV/RLP (PF&R dated 1/3/01, *Doc.  11* at 5, n.5).  Other courts fall into two lines

of cases – the *Moore* and *Newton* line of cases.  *See Moore v. Apfel,* 216 F.3d 864,

868-69 (9th Cir. 2000); *Newton v. Apfel,* 209 F.3d 448, 459 (5th Cir. 2000).

The *Moore* line of cases stems from Ninth Circuit decisions that hold the

provisions in internal Administration manuals, such as HALLEX and POMS, are

not binding and do not create enforceable rights.  That holding ends any further

inquiry into the merits of a due process claim.  "[I]nternal agency documents such

as these [HALLEX and Teletype provisions] do not carry the force of law and are

not binding upon the agency. . . .  Therefore, they do not create judicially

enforceable duties, and we will not review allegations of noncompliance with their

provisions."  *Parra v. Astrue,* 481 F.3d 742, 749 (9th Cir. 2007), *cert. denied,* 128 S.

Ct. 1068 (2008).

The *Moore* line of cases follows the logic of the Supreme Court's per curiam

decision in *Schweiker,* where the Administration's "Claims Manual" was at issue.

The Court described the manual as an "internal . . . handbook" used by field

representatives, and thus is probably the precursor to the POMS.  *Schweiker v.*

*Hansen,* 450 U.S. 785, 786 (1981); *see also supra* note 5.  The Social Security

statute and regulations require a written application to obtain benefits.  *Id.* at 786

& n.1 (citing  42 U.S.C. § 402(g)(1)(D) and 20 C.F.R. § 404.601 (1974),

recodified at 20 C.F.R. §§ 404.602-404.614 (1980)).  The manual in *Schweiker*

instructed "field representatives to advise applicants of the advantages of filing

written applications and to recommend to applicants who are uncertain about their

eligibility that they file written applications."  *Id.* at 786.

Schweiker asked if she was entitled to certain benefits, erroneously told she

was not, was not advised about the advantages of filing or recommended to file

and, therefore, left without filing an application.  She was eventually awarded

benefits and the issue before the Supreme Court was whether the failure to follow

the advise/recommend direction precluded the Administration from denying

benefits for the period when her application had not been filed.  *Id.*  The Court

held that the Administration could enforce the "written application" regulation

and that the failure of its employee to comply with the manual did not change the

outcome because "the Claims Manual is not a regulation.  It has no legal force, and

it does not bind the SSA. Rather, it is a 13-volume handbook for internal use."  *Id.*

at 789.[7]

_____

[7]  The Court has applied the same reasoning in other contexts.  *See, e.g., Christensen v. Harris County,* 529 U.S. 576, 578 (2000) ("Interpretations such as those in opinion letters-like

I think it is likely that the Tenth Circuit would also adopt the *Moore* view

because in the past it has relied on *Schweiker* in stating that the "POMS [manual] is

not legally binding" but is entitled to deference when the manual interprets

Administration regulations. *Henningson v. Director, Office of Workers' Compensation*

*Programs, U.S. Dept. of Labor,* 1999 WL 728061, 4 (10 C.A.10) (10th Cir. 1999).

Also, I find the *Moore/Schweiker* line of cases persuasive as does another District in

the Tenth Circuit and, therefore, find Plaintiff's HALLEX claim without merit. *See*

*McCoy v. Barnhart,* 309 F. Supp. 2d 1281, 1284-85 (D. Kan. 2004).[8]

_____

interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law-do not warrant *Chevron*-style deference.") (citing *Reno v. Koray,* 515 U.S. 50, 61(1995), *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 256-258 (1991), and *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 157 (1991)).

[8] *See McCoy v. Barnhart,* 309 F. Supp. 2d 1281, 1284-85 (D. Kan. 2004) ("Plaintiff argues that the Court should enforce the HALLEX provisions, and Defendant argues the HALLEX is not enforceable on judicial review. Plaintiff cites no authority that the HALLEX is enforceable by a district court, but the Defendant alerts the Court to a Fifth Circuit case holding that the agency should not violate the HALLEX where the rights of individuals are affected, unless the violation is without prejudice. *See Newton v. Apfel,* 209 F.3d 448, 459 (5th Cir. 2000). The *Newton* court, in turn, relied on *Hall v. Schweiker,* 660 F.2d 116, 119 (5th Cir. 1981). *See* 209 F.3d at 459. The *Hall* case, however, dealt with a Social Security Ruling (SSR), not the HALLEX. *See* 660 F.2d at 118-19. The distinction is important because, unlike the HALLEX, the administrative regulations require the SSRs to be published as 'binding on all components of the Social Security Administration.' 20 C.F.R. § 402.35(b)(1); *see Nielson v. Sullivan,* 992 F.2d 1118, 1120 (10th Cir. 1993)('The agency's rulings are binding on an ALJ.'). Thus, while the SSRs do not have the force of law, they are distinguishable from an internal procedure manual such as the HALLEX. *See Holohan v. Massanari,* 246 F.3d 1195, 1202 n. 1 (9th Cir. 2001); *Moore v. Apfel,* 216 F.3d 864, 868-69 (9th Cir.2000); *Lauer v. Apfel,* 169 F.3d 489, 492 (7th Cir. 1999). . . . Therefore, the Court concludes that the provisions of HALLEX I-2-425(D) do not have the force of law, are not binding on the Defendant, and do not provide a basis for the Court to rule.").

Alternatively, the result is the same under the *Newton* line of cases. These cases stem from Fifth Circuit decisions that also hold HALLEX and POMS provisions are not binding on a court, but further hold that if the Administration does not follow its own procedures and prejudice results, then the claimant is entitled to relief.[9] Courts that subscribe to the *Newton* view, or apply it in the alternative, emphasize that the notion of procedural due process in the Social Security arena typically means a full and fair hearing before the ALJ.[10] The

_____

[9]  *See, e.g., Newton v. Apfel,* 209 F.3d 448, 459 (5th Cir. 2000) ("While HALLEX does not carry the authority of law, this court has held that 'where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required.'  *See Hall v. Schweiker,* 660 F.2d 116, 119 (5th Cir. 1981).  If prejudice results from a violation, the result cannot stand.  *Id.*").

        The proposition that prejudice is required to establish a violation is consistent with Tenth Circuit decisions that apply the concept of harmless error where technical errors or procedural irregularities have no bearing on the substance of the ALJ's decision.  *See, e.g., Allen v. Barnhart,* 357 F.3d 1140, 1145 (10th Cir. 2004) (citing as examples *Gay v. Sullivan,* 986 F.2d 1336, 1341 n. 3 (10th Cir. 1993), *Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir. 1990), and *Glass v. Shalala,* 43 F.3d 1392, 1396-97 (10th Cir. 1994)); *Chuculate v. Barnhart,* 170 Fed. App'x 583, 587 (10th Cir. 2006) ("the ALJ's failure to forward plaintiff's unsupported question does not undermine confidence in the result in this case.  *See Gay* . . . We reject plaintiff's due process argument.").

[10]  *See, e.g., Melvin v. Astrue,* ___ F. Supp. 2d ___,2009 WL 321008 at *10  (E.D.N.C. 2009) ("Where courts have found prejudice resulting from a violation of HALLEX, claimant was denied a procedural right at the hearing itself or a defect resulting from some evidence that was or was not considered at the hearing.  *See, e.g., Howard v. Astrue,* 505 F. Supp. 2d 1298, 1302 (S.D. Ala.2007).");  Ellis v. Astrue, 2008 WL 4449452 at * 17  (E.D. Mo. 2008) ("This Court believes that the reasoning and holding of *Passmore* apply to the present case, even though a post-hearing CDIU report is involved rather than a post-hearing physician's report.  Employing the *Eldridge* balancing test, however, this Court must conclude that here, unlike in *Passmore,* Plaintiff's due process rights were violated because the process he was offered as a substitute to a supplemental hearing was inadequate.  As noted above, the letter denying Plaintiff's request for a

HALLEX provision at issue here, however, has no bearing on the fairness of the hearing itself.  Counsel asserts that she needed the hand-written exhibit list to properly appeal and the deficiencies in it evidently made that task more difficult. *See Doc. 14* at 13-14; *Doc. 16* at 6-7; *Record* at 546-48.  But, counsel does not contend that the lack of an exhibit list precluded her from raising any issue before this Court.

Since it is the ALJ's decision under review when the Appeals Council denies review, and Plaintiff is free to raise any issue here even if it was not raised at the Appeals Council level in the first instance, I cannot say that there is any prejudice of the sort that would warrant relief.[11]  That is not to say that I condone what occurred.  Indeed, it seems particularly neglectful of the Appeals Council to fail to

---

supplemental hearing told Plaintiff that he could submit 'a concise brief addressing pertinent issues' within ten days.  This falls short of the alternatives to cross-examination made available to the claimants in *Passmore* and *Flatford*.");  *see also Richardson v. Perales,* 402 U.S. 389, 401-02 (1971); *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976).

[11]  *See, e.g., Sims v. Apfel,* 530 U.S. 103, 107 (2000) ("if, as here, the Council denies the request for review, the ALJ's opinion becomes the final decision"); *id.* at 112 ("we hold that a judicially created issue-exhaustion requirement is inappropriate.  Claimants who exhaust administrative remedies need not also exhaust issues in a request for review by the Appeals Council in order to preserve judicial review of those issues."); *Chuculate,* 170 Fed. App'x at 587 (ALJ failure that does not undermine confidence in result fails to establish violation of due process); *Bordes v. Commissioner of Social Sec.,* 235 Fed. App'x 853, 859 (3rd Cir. 2007) (declining to adopt *Moore* or *Newton* line of cases and holding that claimant's "fundamental fairness claim would fail even under the Fifth Circuit's approach, because she has not shown she was prejudiced").

correct the problem with the exhibit list at the Administrative level when counsel

brought the same to its attention.  *See Record* at 547.

# III.  Substantive Analysis

Although the ALJ's opinion is separated into discrete sections, it is

somewhat analytically jumbled, with the treatment of Steps 2, 3, and 4 overlapping

and indistinct.  Likewise, although Plaintiff does not directly challenge the ALJ's

Step 2 finding, all of Plaintiff's arguments flow from the ALJ's treatment of

Plaintiff's mental impairments and are intertwined with his procedural arguments.

Plaintiff's substantive arguments are that ALJ Willner's credibility and past relevant

work determinations fail to apply the correct legal standards and are not supported

by substantial evidence.  *See Doc. 14* at 4-7, 8-11, 12-13.  Ultimately, I agree with

Plaintiff in several respects and, for the sake of clarity, begin with Step 2.

## A.  *Standards of Review*

If substantial evidence supports the ALJ's findings and the correct legal

standards were applied, the Commissioner's decision stands and Plaintiff is not

entitled to relief.  "'Substantial evidence is more than a mere scintilla and is such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (quoting

*Grogan v. Barnhart,* 399 F.3d 1257, 1261-62 (10th Cir. 2005)).  I can neither

reweigh the evidence nor substitute my judgment for that of the agency.  *Hamlin v.*

*Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004); *see also Langley v. Barnhart,* 373

F.3d 1116, 1118 (10th Cir. 2004).  Thus,

> "The possibility of drawing two inconsistent conclusions
> from the evidence does not prevent an administrative
> agency's findings from being supported by substantial
> evidence." . . .  We may not "displace the agenc[y's]
> choice between two fairly conflicting views, even though
> the court would justifiably have made a different choice
> had the matter been before it *de novo.*"

*Lax v. Astrue,* 489 F.3d 1080, 1084 (10th Cir. 2007).

## B.  ALJ's Treatment Of Plaintiff's Mental Impairments
## Is Not Supported By Substantial Evidence,
## Nor Did The ALJ Apply Correct Legal Standards

At Step 2, Plaintiff bears the burden of showing a mental impairment that is

"severe."  This means more than the diagnosis or presence of a mental impairment

such as depression and anxiety.  *E.g., Cowan v. Astrue,* 552 F.3d 1182, 1186 (10th

Cir. 2008) (citing *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003)).

To qualify, the asserted impairment must "significantly limit" Plaintiff's "mental

ability to do basic work activities."  *See* 20 C.F.R. § 1520(c).  "Understanding,

carrying out, and remembering simple instructions," using "judgment," responding

"appropriately to supervision, co-workers and usual work situations," and dealing "with changes in a routine work setting," are all considered "basic work activities." *Id.*, §§ 1521(b)(2)-(6).  Thus, it is true that Dr. Fredman's and Gabaldon's "[f]indings of 'moderate' limitations [in these areas] *do not, by themselves, prove disability*."  *Morgan v. Astrue*, 302 Fed. App'x 786, 789 (10th Cir. 2008) (emphasis added) (citing Listings 12.04 and 12.06 for disorders based on affect and anxiety that require "marked" rather than "moderate" is the applicable limitation level in determining disability under the regulations).

However, the showing at Step 2 is "*de minimus*" and based solely on the medical evidence of record.  "A . . . mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings."  20 C.F.R. § 404.1508. "Psychiatric signs are medically demonstrably phenomena . . . shown by observable facts that can be medically described and evaluated" and "acceptable laboratory diagnostic techniques . . . include . . . psychological tests." *Id.* at § 404.1528.  It is not based on things like a claimant's credibility, "drug and alcohol lifestyle choices," or the relative merits of different expert opinions that ALJ Willner employed.  *See Record* at 20.  By combining his Step 2 and Step 3 discussion into one section, ALJ Willner introduced matters that should not have been considered.

In addition, he omitted pertinent discussion.  I have not found any decision that holds "GAF" scores do not qualify as acceptable tests for Step 2 consideration, and this Record is replete with scores well under 50, both before and after Dr. Fredman's score of 60.[12]  Yet, nowhere does ALJ Willner discuss that medical evidence in his Step 2 decision.  Many courts, including the Tenth Circuit and other districts in the Tenth Circuit, indicate that failure to consider GAF scores at Step 2 are reversible error or that a Step 2 decision of nonseverity when the record contains GAF scores of lower than 50 are not supported by substantial evidence.  I find them persuasive.[13]  Again, as with Dr. Fredman's and Dr. Gabaldon's findings,

_____

[12]  *See Record* at 277 (11/06/03 – GAF of 42 for current and past year); *id.* at 266 (1/23/04 – GAF of 48); *id.* at 263 (2/20/04 – GAF of 35); *id.* at 208 (6/11/04 – Dr. Fredman prognosis as "good" so long as Plaintiff receives "continuing psychiatric care" and current GAF of 60); *id.* at 257 (6/28/04 – GAF of 48); *id.* at 255 (9/27/04 – GAF of 48); *id.* at 425 (11/21/05 – GAF of 20). "A GAF of 31-40 is extremely low, and indicates some impairment in reality testing or communication or major impairment in reality testing or communication or major impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Salazar v. Barnhart,* 468 F.3d 615, 624 n. 4 (10th Cir.2006) (quotation and alterations omitted).  "A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning, such as inability to keep a job." *Langley v. Barnhart,* 373 F.3d 1116, 1123 n. 3 (10th Cir.2004) (same).  "A GAF score of 51-60 indicates moderate symptoms, such as a flat affect, or moderate difficulty in social or occupational functioning." *Id.* (same).

[13]  *See Lee v. Barnhart,* 117 Fed. App'x 674, 678 (10th Cir. 2004) ("A GAF score of fifty or less, however, does suggest an inability to keep a job. . .  In a case like this one, decided at step two, the GAF score should not have been ignored."); *Bronson v. Astrue,* 530 F. Supp. 2d 1172 (D. Kan. 2008) (decision where ALJ considered GAF scores at Step 2, ultimately concluding that all of the medical evidence did not establish requisite severity); *see also, e.g., Magwood v. Commissioner of Social Sec.,* 2008 WL 4145443 at *2 (3rd Cir. 2008) (medical evidence that claimant was "receiving psychiatric services on a regular basis, was engaged in therapeutic

while "a low GAF score does not alone determine disability, [it is] a piece of

_____

counseling on a weekly basis, was taking antidepressants, was assessed as functioning with a GAF of 55-60, and had an opinion from a treating psychiatrist that she was unable to work on a sustained basis . . . was more than sufficient to satisfy step two's *de minimis* threshold," thus, Step 2 decision held "not supported substantial evidence"); *McPherson v. Astrue*, 2009 WL 529221 at *12 (S.D.W.Va. 2009) ("Plaintiff's GAF score may be relevant in a more generalized assessment of the severity of mental impairment at step two"); *Jackson v. Astrue*, 2009 WL 248491, 8 (D. Kan. 2009) ("The step two requirement is generally considered a *de minimis* screening device to dispose of groundless claims; thus, reasonable doubts on severity are to be resolved in favor of the claimant. . . . Mr. Garrett's RFC assessment and GAF scores provide evidence which would support a finding that plaintiff had severe mental impairments, *i.e.*, that plaintiff's mental impairment would have more than a minimal effect on his or her ability to do basic work activities. The ALJ improperly ignored the GAF score of 50 by Darlys Miller, another treating source. Such a score suggests an inability to keep a job, and thus would clearly suggest that plaintiff has a severe mental impairment. Thus, contrary to the findings of the ALJ, Mr. Garrett's assessment has some support in the record from another treating source which should be considered when this case is remanded."); *Miller v. Astrue*, 2008 WL 5129874 at **1-2 (W.D. Wash. 2008) ("Here, the ALJ erred when he did not consider Plaintiff's depression a severe impairment at step-two. Ms. Miller has a long history of treatment for depression. DDS, staff psychologists, Dr. van Dam and Dr. Clifford, opined Ms. Miller suffered from depressive disorder, recurrent, moderate; and dependent personality traits . . . The doctors opined that Ms. Miller is moderately limited in her ability to understand and remember detailed instructions; moderately limited in her ability to carry out detailed instructions; and moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods . . . Treatment records in evidence show she was being treated at the Center for Behavioral Solutions (CBS) from July 2003 through the time of hearing, for major depressive disorder . . . Her treatment records show GAF scores in the 40's and 50's, with suicidal ideation, poor hygiene, pressured speech, agitated mood, anxious and tearful affect, inability to act to preserve state assisted support, and scattered thoughts and need of multiple re-directions"); *Salazar v. Astrue*, 2008 WL 5046403 at *7 (W.D. Okla. 2008) ("GAF score reflects serious impairment in social, occupational, or school functioning, such as inability to keep a job" but ALJ did not discuss it or other evidence and because it "'is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.' *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) . . . the ALJ's step two finding is flawed."); *Stewart v. Astrue*, 2008 WL 4829926 at *4 (C.D. Cal. 2008) (though evidence not sufficient to establish a disability, fact that Plaintiff worked with a mental impairment did not establish nonseverity as diagnosis of depression was confirmed by consultative psychiatrist; Plaintiff given GAF of 58 yet "ALJ did not address any of plaintiff's GAF scores," and holding that in "light of this evidence, plaintiff has proven that she suffered from more than a slight mental impairment.").

27

evidence to be considered with the rest of the record." *Petree v. Astrue,* 260 Fed.

App'x 33, 42, (10th Cir. 2007) (citing *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235,

241 (6th Cir. 2002) and *Lee v. Barnhart,* 117 Fed. App'x 674, 678 (10th Cir. 2004)).

An ALJ "may not ignore evidence that does not support his decision, especially

when that evidence is significantly probative." *Briggs ex rel. Briggs v. Massanari,* 248

F.3d 1235, 1239 (10th Cir. 2001) (internal quotations and citation omitted).

Furthermore, ALJ Willner came to the conclusion that because he

determined "the severity of mental impairments" did not satisfy Steps 2 or 3, then

he did not have to consider Plaintiff's mental limitations at Steps 4 and 5. *See*

*Record* at 21.  This is incorrect.  He found that Plaintiff had physical impairments,

including arthritis of the spine.  The regulations specifically require an ALJ to

consider "nonsevere medically determinable" impairments in the residual

functional capacity decision. *See* 20 C.F.R. § 404.1545(a)(2) ("We will consider all

of your medically determinable impairments of which we are aware, including your

medically determinable impairments that are not severe"); *id.,* § 404.1545(e)

("When you have a severe impairment [that does not meet a Listing] we will

consider the limiting effects of all your impairment(s), even those that are not

severe, in determining your residual functional capacity.").  The Administration's

own physicians identified limitations that the vocational expert testified would

eliminate all jobs, but ALJ Willner failed to discuss that evidence.

Another error not raised by Plaintiff bears mentioning also.  In this Circuit, it is error to apply the statutory and regulation "addiction" considerations until after making the disability determination.  If a disability is found, then, and only then, is that regulation applied.[14]  In his residual functional capacity analysis, ALJ Willner acknowledges that Plaintiff was addicted to pain medication before he was hospitalized.  *Record* at 23.  One thing that is impossible to ignore about the medical record in this case is that, after he completed his detoxification program Plaintiff was medicated with numerous drugs, but continued to seek out particular drugs from his providers, who did not always accommodate Plaintiff because of his history of addiction.  In rejecting that Plaintiff had any severe mental impairments,

---

[14]  42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."); 20 C.F.R. § 404.1535(a) ("If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability."); *see also, e.g., Drapeau v. Massanari,* 255 F.3d 1211, 1214-15 (10th Cir. 2001) ("The ALJ's analysis of plaintiff's alcohol abuse was flawed in several respects.  First, the ALJ failed to determine whether plaintiff was disabled prior to finding that alcoholism was a contributing factor material thereto.  The implementing regulations make clear that a finding of disability is a condition precedent . . .  The Commissioner must first make a determination that the claimant is disabled. . . .  The ALJ cannot begin to apply § 423(d)(2)(C) properly when, as here, he has not yet made a finding of disability."); *Alderete v. Barnhart,* 114 Fed. App'x 353, 354 -358 (10th Cir. 2004) (application after finding of disability at Step 3 by meeting a listing).

ALJ Willner noted that Plaintiff "responded well to medication and support groups," but that his "medical psychiatric conditions deteriorated when he utilized alcohol and drugs or when he discontinued his medication." *Record* at 20. ALJ Willner thus concluded that "claimant's use of drugs and alcohol were associated with lifestyle choices and did not significantly restrict the claimant's functional ability." *Id.* This consideration was made at the Step 2/3 section. ALJ Willner then went on to reject Plaintiff's contention that he had severe back pain because of his history of dependency on pain medication. While these comments seem to recognize the relationship between Plaintiff's addictions, mental conditions post-hospitalization, and inability to secure certain drugs, it injects the "lifestyle" condemnation at the wrong end of the analysis.

## C.  *Reversal vs. Remand*

I recognize that this matter has been pending for years but reversal for an award of benefits is not appropriate because additional factfinding is required. *E.g.*, *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006). Those additional facts include, for example, the severity of mental limitations, the functional limitations associated with them, the duration of any functional limitations, and whether the application of the "addiction" statute and regulations would preclude any award of

benefits.  Certainly the credibility decision will be complicated by Plaintiff's death.

However, the record is vast and should be considered in great detail on remand.

Wherefore,

IT IS HEREBY ORDERED that Plaintiff's motion be granted in part, and

this matter remanded to the Commissioner for further proceedings.


_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.